# Supreme Court of Florida

————————

No. SC13-1232

————————

**KENNETH R. JACKSON,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[March 23, 2017]

PER CURIAM.

Appellant Kenneth R. Jackson was convicted of the first-degree murder of Cuc Thu Tran, sexual battery with a deadly weapon, second-degree arson, and grand theft of a motor vehicle.  Jackson was sentenced to death for the murder conviction.  We have jurisdiction.  See art. V, § 3(b)(1), Fla. Const.

## FACTS

At approximately 6:30 a.m. on September 13, 2007, an individual who lived at Bullfrog Court in Gibsonton initially heard noises that sounded like gunshots, which he did not originally consider to be unusual.  He walked outside to investigate, but returned inside when he did not observe anything out of the

ordinary. Approximately twenty or thirty minutes later, he heard further noises that sounded like glass breaking or tires exploding. He again walked outside, this time to the sound of an emergency siren, and he saw fire and smoke rising from a burning vehicle. Firefighters from the Hillsborough County Fire Rescue responded to the fire at approximately 7:03 a.m., and in the process of extinguishing the fire, they discovered a body inside the van. Officers from the Hillsborough County Sheriff's Office (HCSO) arrived shortly thereafter. A lighter was recovered a short distance away from the van. After the fire was extinguished, the van was towed to an HCSO garage for further investigation.

Approximately twelve miles northwest of Gibsonton, in Seffner, seventeen-year-old Truong Tran returned home from school that afternoon and found his father, Banh Tran, very distraught. Cuc Tran, Truong's mother and Banh's wife, was not home, but her keys, cell phone, and purse were in their mobile home residence. Truong called the police and reported that Cuc was missing and had not arrived as scheduled at work that morning. Truong also informed officers that his mother usually jogged to and from a local church every morning before work.

HCSO investigators recovered several pieces of evidence found in front of the St. Francis of Assisi Church in Seffner, including a pair of black pants, shoes, socks, and a pink hair roller. The items were found near a patch of grass that

appeared to be covered in blood, and the hair roller also appeared to be covered in blood.

The investigation further expanded to encompass the van found burning in Gibsonton. Luis Carrero owned a 1993 midnight blue Dodge Caravan that he hoped to sell; he left the van with a "For Sale" sign in front of his place of employment, an Advanced Auto Parts Store in Seffner. The van was seen in the business parking lot at 9:30 p.m. on September 12, 2007, but was not in the parking lot by 6:30 a.m. on September 13. In the early morning hours of September 13, 2007, one witness observed a blue minivan driving at five or six miles per hour as she turned from Martin Luther King Boulevard onto State Road 579. Another witness reported that he was cut off by a speeding Chrysler minivan that also ran a red light as it headed west on Martin Luther King Boulevard.

During the course of the investigation, Detective Troy Morgan encountered Christina Elhelw, a clerk at a BP gas station at the intersection of State Road 579 and Martin Luther King Boulevard. Elhelw informed Morgan that on September 14, Jackson, who would regularly stop by the BP gas station and talk to her, had asked her and William Driskell, another regular customer, whether they had heard about the crime. Jackson told them that a Vietnamese woman who lived in a nearby trailer park had been found in a burning van in Gibsonton, and the van had been stolen from the nearby Auto Parts Store in Seffner. He also told them that

- 3 -

law enforcement recovered some articles of clothing near Clay Pit Road. Further, Jackson told them that he had previously seen the victim jogging in the neighborhood. Jackson explained that he learned this information after he had been riding his bicycle and was stopped by law enforcement officers, who asked him whether he had seen anything unusual on September 13. Elhelw thought Jackson seemed more excited than sympathetic about this information, and Driskell thought Jackson appeared to brag about having more information than either of them.

In September 2007, Jackson lived with Linda and Wallace O'Neal. Wallace had known Jackson as a child because Wallace was the live-in boyfriend of Jackson's grandmother, who had custody of Jackson when he was a young child.[1] Jackson did not have a car, cell phone, or steady employment when he lived with the O'Neals in September 2007; he spent part of his days at the local Walmart and a local gas station. According to Linda, Jackson was not home on the morning of September 13. Linda had also received several phone calls from Iris Williams, a friend of hers who had encountered Jackson in Gibsonton earlier that morning walking north. Jackson told Williams that he had been locked out of his home and needed a place to stay. Williams thought it was odd to see Jackson in Gibsonton

_____

1. Jackson's grandmother had passed away when he was a teenager.

- 4 -

and attempted to contact Linda. Linda testified that Jackson walked into their home in Seffner between 1 and 1:30 p.m. that afternoon. Jackson was sweating, and the bike that he usually rode had remained in the home. Jackson moved out of the O'Neals' home the following Monday.

After receiving the phone calls from Williams, Linda contacted Margaret Gofinch, a young woman who had known Jackson from school. In September 2007, Jackson expressed interest in dating Gofinch and contacted her daily, but she was not interested and was dating someone else. On September 12, 2007, she worked at a McDonald's Restaurant in Riverview until 10:00 p.m. and received several phone calls from Jackson throughout the night; the phone calls became more frequent as the night progressed. Jackson wanted to see her that night when she finished work, but she declined and went home.

On September 20, Jackson agreed to be interviewed by Detectives Morgan and Bunten. He told the detectives that on the morning of September 13, he stopped at a Walmart and later met law enforcement officers conducting a traffic stop, but denied that he was in Gibsonton or otherwise involved in Tran's murder. However, when the detectives informed him that Linda O'Neal and Margaret Gofinch had informed them that Jackson was not at home on the night of September 12 or the morning of September 13, Jackson told them that he found himself locked out of the O'Neals' trailer. Upset, he tried contacting Gofinch for a

- 5 -

place to stay for the night, but when she refused, he biked to Gibsonton. He also initially denied encountering Iris Williams in Gibsonton, but later admitted that he had seen her that morning and explained that he did not previously mention that fact because he did not want to be associated with her. Jackson also admitted that he had spoken to a woman at a church in Gibsonton to ask for a ride back to Seffner. He also told them that he had ridden his bike home from Gibsonton, but explained that he had taken his time to get home, a trip that ultimately lasted twelve hours. At the end of the interview, Jackson agreed to provide the detectives the shirt and shoes he was wearing, which he told them were what he had worn on September 13.

Bunten and Morgan interviewed Jackson again on September 27. They confronted Jackson with the fact that they did not believe his account of the events of September 13, but Jackson denied that he had seen the victim or stolen the car. Later that day, Jackson was arrested. On October 10, 2007, a grand jury indicted Jackson for the first-degree murder of Tran, sexual battery with a deadly weapon, second-degree arson, and grand theft of a motor vehicle.

The trial court conducted a pretrial Frye[2] hearing to determine whether the defense could present evidence during the penalty phase pertaining to quantitative

---

2. Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).

- 6 -

electroencephalography (qEEG) testing. Both parties produced multiple scientific publications discussing the value of qEEG as a diagnostic tool for neurological and psychiatric conditions. Additionally, both parties presented testimony from psychologists, neurologists, and psychiatrists who debated the relative acceptance of qEEG in their respective fields for the purposes of diagnosing brain injuries. The trial court ruled that the qEEG evidence as used in diagnosing brain injuries or disorders did not satisfy the Frye standard of admissibility.

During trial, the State presented testimony from the emergency responders, crime scene investigators, detectives, and other witnesses who encountered Jackson between September 12 and 14, 2007. A woman who performed community service at First Baptist Church in Gibsonton testified that one morning in September, a man who was on foot approached her and asked for money. She directed him to another individual in the church, who was unable to help him, and he became very upset.

Additionally, the State presented surveillance footage from the Seffner Walmart from the night of September 12 until approximately 6:45 a.m., September 13. Jackson was observed at approximately 5:10 a.m. and again at 5:13 a.m. Further, an individual who matched Jackson's appearance was also visible at approximately 5:40 a.m.

Several forensic investigators also testified on behalf of the State. One detective testified that he observed a notch across the van's door handle, which he had previously seen in other Chrysler vehicles that had been stolen. Randy St. Clair of the State Fire Marshal's Office testified that the fire in the van originated in the center of the vehicle, near the driver and front passenger seats, which excluded the possibility that the origin of the fire was in the engine compartment. Further, he explained that there was an unusual and ultimately unidentified sticky substance covering the victim's hair, skin, and torso that acted as a fire retardant and preserved those parts of the victim. He explained that the fire was ignited by an open flame, such as a match or lighter; the only accelerant present was the upholstery and foam of the van seats. He opined that the apparent motive of the fire was concealment of the victim.

Evelyn Bigford, a forensic analyst for the Florida Department of Law Enforcement, testified that she examined the black pants, pair of shoes, pair of socks, and pink hair roller for the presence of blood, semen, and DNA. The pants testified positive for the presence of blood, but not semen. DNA obtained from the blood on the pants matched Cuc Tran to the exclusion of 1 in 15 quadrillion Caucasians, 1 in 2 quintillion African-Americans, and 1 in 6.8 quadrillion Southeastern Hispanics. Bigford did not further analyze the shoes, socks, or hair roller. Additionally, Bigford detected sperm cells in Tran's vagina, as well as a

mixed DNA profile from vaginal tissue obtained from Tran. After she eliminated Tran's DNA profile, the foreign DNA profile matched Jackson to the exclusion of 1 in 34 quadrillion Caucasians, 1 in 750 quadrillion African-Americans, and 1 in 65 quadrillion Southeastern Hispanics. She also compared the foreign DNA profile to that of Tran's husband, but did not find a match. During cross-examination, Bigford testified that Jackson was a possible donor, and she could not explain how the semen was deposited in Tran.

Dr. Amy Sheil, the assistant medical examiner who responded to the crime scene and performed the autopsy, also testified. She explained that Tran suffered heat amputation of several of her extremities, and it was possible that Tran could have incurred other injuries that were obscured by the thermal injuries. Additionally, Dr. Sheil described how Tran was discovered in a pugilistic stance, another thermal injury that resulted in her fingers being curled into her palms, her elbows flexed, and her left knee slightly bent.

Dr. Sheil explained that Tran was found with four stab wounds and two incised wounds to her neck, although the appearance of some of the wounds had been altered by the thermal injuries. Three of the stab wounds would have been fatal without medical attention, and one of the stab wounds would have made it difficult for Tran to talk or scream. Dr. Sheil opined that the cause of death was stab wounds that penetrated Tran's jugular vein and carotid artery, which resulted

in loss of consciousness and exsanguination. She believed that Tran lost consciousness within seconds to minutes, and death followed within minutes. Additionally, Dr. Sheil examined her larynx and trachea and found no evidence of smoke or soot. Similarly, there was no indication of unusually high levels of carbon monoxide, a byproduct of smoke, in Tran's blood. Accordingly, Dr. Sheil opined that Tran was dead before the fire started.

The State also presented testimony from Antonio Gonzalez and Michael Kennedy, individuals who were temporarily housed together with Jackson during his pretrial incarceration. Gonzalez testified that Jackson became friendly with him and told him that when Jackson returned home one night, he found himself locked out of his home. Angry, Jackson wandered away from his home and stole a van from a store that sold automobile parts. Jackson told them that he drove the van back to his neighborhood, where he knew that a heavyset Asian woman would go out for her regular early morning jog. Jackson told Gonzalez that he parked the van in the parking lot of a church and raped the woman at knifepoint. Jackson bragged to Kennedy that "he fucked her good." According to Kennedy, the woman asked Jackson not to hurt her; in response, Jackson told her to shut up or he would kill her. When the woman started screaming, he stabbed her in the throat with a knife. With her clothes and blood evidence remaining on the grass, Jackson placed the woman in the van and drove away from the area where he lived to

Gibsonton or Riverview, an area that Jackson was familiar with because some friends lived there. Jackson wanted to find a place to conceal the body, but when the van became stuck, he started a fire in the van with a lighter to dispose of the body. He told Kennedy that he thought the fire would destroy any DNA evidence that could inculpate him.

Additionally, the State presented evidence that would preclude the involvement of another individual. During the initial investigation, HCSO officers recovered a wallet with a driver's license in a trash can that was near the van. The individual identified by that license testified that his truck had been stolen on September 11, 2007, between 5:00 and 6:30 p.m.; although his vehicle was recovered that evening, his wallet was not. The State presented testimony from that individual, the law enforcement officers who investigated that matter, and one of the perpetrators of that crime.

Defense counsel proceeded under two related theories. Defense counsel suggested that another party was responsible, specifically, Tran's husband, Banh Tran. During cross-examination, Banh admitted that he did not regularly spend his nights at Cuc's trailer, the title of which was solely in her name.

Alternatively, defense counsel questioned the evidence that connected Jackson to the crime scene. Jackson presented testimony from Anjali Ranadive, a DNA expert. She reviewed the DNA results and testified that although she could

not exclude Jackson as a contributor to the DNA recovered from the sperm found in Tran's vagina, she also could not conclusively identify Jackson as the contributor. Additionally, defense counsel recalled Detective Bunten, who testified that photographs taken of Jackson on September 20, 2007, did not reveal any injuries to his hands or the backs of his legs. Further, during closing statements, defense counsel suggested that the State's timeline was implausible.

Jackson also presented testimony from three witnesses who were interviewed by law enforcement in September 2007 during traffic surveys near the Seffner crime scene. One man who regularly drove a semi-tractor trailer truck through Seffner testified that he saw an older Dodge or Chrysler minivan pull out of the parking lot of a church between Clay Pit Road and Martin Luther King Boulevard. He testified that he saw two Hispanic men in the driver and passenger seats of the van, along with a woman in the back of the van who was moving, but was largely covered by a blanket. Another woman who regularly traveled through Seffner early in the morning testified that she saw an Asian woman jogging along the side of the road in a white shirt and dark pants. She also saw a blue minivan that had been driving erratically pull over to the side of the road where it stopped, and a driver exited the van. Finally, a school bus driver testified that she had observed two young men early one morning in Gibsonton walking away from Bullfrog Creek Road towards Gibsonton Drive, one of whom carried a gas can.

However, the bus driver was unable to provide an exact date when she had seen these men.

Jackson was convicted of first-degree murder under theories of both premeditated murder and felony murder, as well as sexual battery with a deadly weapon, second-degree arson, and grand theft of a motor vehicle. During the penalty phase, the State presented a victim impact statement from Tran's oldest son. The State did not present any additional evidence in support of aggravation.

Jackson presented testimony from two of his former teachers and a school psychologist who had evaluated Jackson. Teresa Gribbon, who taught Jackson in a special education class when he lived in Texas, testified that Jackson struggled academically and did not appear to form any attachments. When she taught Jackson, he was eleven years old in fourth grade, but read at a first-grade level. Jackson lived with Wallace O'Neal and his grandmother, whom Gribbon thought lacked parenting skills and failed to set boundaries for Jackson. At one point during the year, Jackson began taking new medication that escalated his physical aggression. His grandmother became concerned about the side effects of the medication and permitted Jackson to sleep in the same bed with her. Gribbon was concerned about that behavior because of Jackson's age and the fact that Wallace O'Neal lived with Jackson and his grandmother.

Rosemary Borden testified that she taught Jackson in special education classes when he was in fifth grade in Gibsonton, Florida. Jackson was belligerent, defiant, and antagonistic towards other children. He arrived to school dirty and with poorly maintained clothing. She also testified that he had poor attendance. She added that he received Bs and Cs in her class, but he was not instructed at his grade level. Borden further testified that Jackson's disruptive behavior frequently resulted in his removal from class, and although it was regular practice to contact the parents or guardians of a child who had been removed, she never successfully contacted Jackson's guardian. Additionally, after the death of his uncle, Jackson drew a picture of himself, dead on a road, and wrote, "Kenny is dead. Kenny will die." Borden reported this incident to school administrators, and Jackson was detained pursuant to the Baker Act for overnight observation.

Cathy Wetherington, a school psychologist, testified that she evaluated Jackson in April 1995. She conducted a Wechsler Intelligence Scale-III test on Jackson, who received a full scale IQ score of 75, with a 75 verbal score and a 79 performance score. He also obtained low academic achievement scores: 53 in broad reading, 68 in broad math, and 32 in writing, which were low compared to the average range of 90 to 110. She considered his score of 54 in processing speed to be very deficient, and his short term memory score of 84 to be below average. Wetherington attempted to arrange a conference with his grandmother, but that

conference never occurred.  She recommended that Jackson be placed in classes designed for severely emotionally disturbed children, but she did not know if her recommendation was ever followed.  Her report also indicated that Jackson appeared to use aggression to cope with stress and that Jackson was worried that he and his siblings might grow up to be "killers."  However, during cross-examination, she admitted that Jackson was also tested with an older version of the Wechsler Intelligence Scale, the WISC-R, when he was in second grade and received a full scale IQ score of 85.  Further, there was no indication in her report that Jackson was malnourished, dirty, or unkempt.

Jackson also presented testimony from Dr. Yolanda Leon, a school psychologist, and Dr. Steven Gold, a trauma psychologist.  Dr. Leon reviewed Jackson's school records and interviewed Jackson, his family members, his friends, former teachers, and former school psychologists, but was not asked to conduct neuropsychological testing or provide a diagnosis.  Jackson's biological mother, Patricia Helms, reported that she conceived Jackson when she was fourteen years old and his biological father was twenty-eight years old.  When Jackson was six months old, Helms left him in the care of his grandmother, who was thirty years old, and her grandmother's boyfriend, Wallace O'Neal.  Jackson met his biological father only once, when he was six years old.

When Jackson lived with his grandmother and Wallace, he suffered from instability, chaos, and neglect, as evidenced by school reports that he was dirty and suffered from head lice and ringworm. When he was six or seven years old, he was in a car accident and was ejected from the car that was traveling at 30 miles per hour because he was not wearing a seatbelt. Jackson was encouraged to steal food because the household lacked money to purchase enough food. Both his grandmother and Wallace abused drugs and alcohol. Additionally, an uncle who had lived with Jackson when he was a child died of a drug overdose.

Dr. Leon also testified that Jackson was physically and sexually abused. She received reports that Jackson's stepfather tortured Jackson by placing him in a trailer during the summer and requiring him to repeatedly hit a cemented four-by-four plank with a baseball bat until the plank broke. His stepfather also screwed the windows of the trailer shut and left Jackson inside for several days at a time. Jackson's mother also reported that Jackson's stepfather once threatened that if Jackson did not perform oral sex on him, Jackson would be required to walk home. There were also allegations that Wallace O'Neal sexually abused Jackson.

Further, Dr. Leon testified that Jackson had engaged in self-injurious behavior and exhibited suicidal ideation. Her conclusion was based on reports of Jackson's behavior as a child and as an adult during his incarceration. Dr. Leon opined that an individual who had encountered the traumas that Jackson did would

have extremely poor abilities to regulate his emotions and adopt maladaptive behavioral patterns. She testified that Jackson appeared to exhibit a personality disorder, and she would not be surprised if he had an antisocial personality disorder.

Dr. Gold evaluated Jackson with the Adverse Childhood Experiences (ACE) test, which includes a list of ten experiences that are associated with long-term psychological effects if a child encounters one or more of them. The ten experiences reviewed by the ACE include: physical neglect; emotional neglect; physical abuse; sexual abuse; verbal abuse; at least one household member who abused substances; at least one household member who was incarcerated during the subject's childhood; domestic violence in the household; at least one household member who suffered from severe mental illness, depression, or suicide; and a household without one or both biological parents. Dr. Gold testified that the more factors that a child encounters, the more likely that he or she will have a lower IQ, trouble controlling emotions, poor social and emotional adjustments, depression, disassociative disorders, and a lower life expectancy. He testified that Jackson had experienced all ten ACE factors, which was rare. Dr. Gold also testified that he would not be surprised if a child who encountered all ten ACE factors subsequently developed into a manipulative or violent adult or suffered from a pathological or personality disorder.

- 17 -

In rebuttal, the State presented testimony from Dr. Wade Myers, a forensic psychiatrist. Dr. Myers opined that Jackson has antisocial personality disorder. He also questioned the validity of the sexual abuse allegations because Jackson was the only person who reported those allegations, despite the fact that Jackson was closely monitored by his teachers and school psychologists as a child.

At the conclusion of the penalty phase, the jury recommended the death penalty by a vote of eleven to one. The jury was given instructions on three aggravating circumstances: the murder was committed during the course of a sexual battery; the murder was especially heinous, atrocious, or cruel (HAC); and the murder was cold, calculated, and premeditated (CCP). However, the jury was not instructed to make special findings with respect to aggravation, mitigation, or the relative weight of either.

During the Spencer[3] hearing, Jackson's mother testified on his behalf. She testified that she was a teenager when Jackson was born; Jackson's father made arrangements that either he or her mother would receive custody of Jackson. However, she explained that she had a good relationship with her son, who was also close to and protective of his sister. Jackson also renewed the issue of

---

3. Spencer v. State, 615 So. 2d 688 (Fla. 1993).

presenting qEEG evidence, but the trial court refused to reconsider its denial of Jackson's previous motion.

On June 5, 2013, the trial court issued its sentencing order. The court found that the State had proven the following two aggravating circumstances beyond a reasonable doubt: the murder was committed during the commission of a sexual battery and HAC. The court afforded each aggravating circumstance great weight. Although the jury was provided an instruction concerning the CCP aggravating circumstance, the court concluded that the State failed to prove this circumstance beyond a reasonable doubt.

The court also found the following mitigating circumstances: (1) Jackson endured a dysfunctional family background that resulted in an unstable environment (moderate weight); (2) he suffered psychological trauma from the deprivation of parental nurturing when he was an infant and toddler (minimal weight); (3) he was abandoned by his parents (minimal weight); (4) he lacked healthy role models (minimal weight); (5) he was sexually abused by his grandmother's boyfriend as a teenager "and his life was pre-determined during the years of his early development based on behavior patterns witness[ed] by former school personnel" (moderate weight); (6) he developed pathological behaviors due to his history of familial dysfunction, which was evidenced by cutting and self-mutilation (minimal weight); (7) his history of familial dysfunction resulted in an

inability to form attachments or regulate his emotions (moderate weight); (8) he

suffers from a personality disorder due to his childhood experiences and genetic

traits (moderate weight); (9) he grew up in extreme poverty and was encouraged to

steal by his family (minimal weight); (10) he was in the care of neglectful

guardians who encouraged criminal conduct at a young age (moderate weight);

(11) his caregivers had a history of substance and alcohol abuse (minimal weight);

(12) as a young child, he was affected by the suicide of a loved one (minimal

weight); and (13) he had positive relationships with his mother, younger sister, and

grandmother as a child (minimal weight). The court refused to consider the

proffered qEEG evidence in mitigation. The court made an additional finding with

respect to mitigation:

> The Court, sua sponte, additionally determines by a preponderance of
> the evidence that the above circumstances cumulatively diminished
> Jackson's capacity or ability to conform his conduct to the
> requirements of the law, but does not determine that such
> circumstances diminished his capacity or ability to appreciate the
> criminality of his conduct. The Court accords this mitigating
> circumstance moderate weight.

After weighing the aggravating and mitigating circumstances, the court

sentenced Jackson to death for the murder of Tran, life imprisonment without the

possibility of parole for sexual battery, a term of fifteen years for second-degree

arson, and a term of five years for grand theft of a motor vehicle. The court

directed that the prison terms would be served concurrently and awarded five years, five months, and three days credit for time served.

Following the filing of Jackson's appeal before this Court, the United States Supreme Court issued its decision in Hurst v. Florida (Hurst v. Florida), 136 S. Ct. 616, 619 (2016). This Court ordered supplemental briefing to address that decision. This review follows.

## ANALYSIS

### Guilt Phase

Peremptory Challenges

Jackson alleges that section 913.08, Florida Statutes (2007), which governs peremptory challenges during voir dire, is both facially unconstitutional and unconstitutional as applied to his case. His primary constitutional challenge is that he would have been entitled to a maximum of thirty-two peremptory challenges if he had been charged separately for each count, and therefore his rights under the Equal Protection Clause of the Fourteenth Amendment were violated because differently situated defendants would receive different numbers of peremptory challenges. He also asserts that the trial court erred by denying his request for additional peremptory challenges. We reject both claims.

Constitutional challenges to the validity of a statute raise questions of pure law and are therefore subject to de novo review by this Court. E.g., State v.

Catalano, 104 So. 3d 1069, 1075 (Fla. 2012). This Court presumes that statutes are constitutional unless and until a party challenging the law proves that the statute is not constitutional under any set of circumstances. See Fla. Dep't of Revenue v. City of Gainesville, 918 So. 2d 250, 256 (Fla. 2005); Chi. Title Ins. Co. v. Butler, 770 So. 2d 1210, 1214 (Fla. 2000).

Both the United States Supreme Court and this Court have recognized that although there is a constitutional right to an impartial jury, there is no constitutional right to peremptory challenges, which are instead considered creatures of statute. United States v. Martinez-Salazar, 528 U.S. 304, 311 (2000); Ross v. Oklahoma, 487 U.S. 81, 88 (1988); Busby v. State, 894 So. 2d 88, 98 (Fla. 2004). Section 913.08 grants ten peremptory challenges to criminal defendants charged with capital crimes, six peremptory challenges to defendants charged with lesser offenses punishable by imprisonment longer than twelve months, and three peremptory challenges to defendants facing all other charges. A trial court, in its discretion, may grant additional peremptory challenges. Fla. R. Crim. P. 3.350(e); Parker v. State, 456 So. 2d 436, 442 (Fla. 1984). Thus, there is a right under Florida law to a certain number of peremptory challenges, but there is no right or entitlement to additional peremptory challenges beyond those established in section 913.08.

Statutes that abridge a right that is not fundamental or adversely impact a class that is not considered suspect are only unconstitutional if there is no rational relationship between the statute and a legitimate state interest. E.g., Lite v. State, 617 So. 2d 1058, 1060 n.2 (Fla. 1993). Section 913.08 is rationally related to a legitimate interest in providing fair and efficient trials. Further, as there is no right to additional peremptory challenges, Jackson cannot show that any right was violated by the trial court's discretionary refusal to grant additional challenges. Jackson's nebulous equal protection challenge similarly fails. Although "death is different," criminal defendants are not generally considered a suspect class, not even those sentenced to death. See Crump v. State, 654 So. 2d 545, 547 (Fla. 1995); Gov't of Virgin Islands v. Hodge, 359 F.3d 312, 326 (3d Cir. 2004). Finally, Jackson has insufficiently briefed his claim that section 913.08 violates his right to be free from cruel and unusual punishment under the Eighth Amendment. See Heath v. State, 3 So. 3d 1017, 1029 n.8 (Fla. 2009) ("Vague and conclusory allegations on appeal are insufficient to warrant relief."). Therefore, we reject his facial constitutional challenge to section 913.08.

Jackson also alleges that section 913.08 is unconstitutional as applied to him because the trial court erroneously denied several cause challenges, forcing him to exercise his peremptory challenges, and denied his motion for additional peremptory challenges. A party that seeks relief for the wrongful expenditure of a

peremptory challenge must both establish that the trial court's denial of a cause challenge was erroneous and identify a juror who was actually on the panel whom the party would have removed with a remaining peremptory challenge. Busby, 894 So. 2d at 102; Conde v. State, 860 So. 2d 930, 941-42 (Fla. 2003); Trotter v. State, 576 So. 2d 691, 693 (Fla. 1990). A trial court must excuse a juror where there is reasonable doubt whether the juror is impartial. Banks v. State, 46 So. 3d 989, 995 (Fla. 2010) (citing Kopsho v. State, 959 So. 2d 168, 170 (Fla. 2007)). To determine whether such reasonable doubt exists, the trial court should consider the context and entirety of the juror's responses. See Matarranz v. State, 133 So. 3d 473, 484 (Fla. 2013); Kopsho, 959 So. 2d at 170. A reviewing appellate court should ensure that the record provides support in the form of any findings regarding a juror's competence. Matarranz, 133 So. 3d at 484 (citing Trotter, 575 So. 2d at 694; Carratelli v. State, 961 So. 2d 312, 319 (Fla. 2007)). Absent manifest error, we defer to the trial court's determinations on cause challenges to prospective jurors. E.g., Conde, 860 So. 2d at 939.

During voir dire, Jackson sought to dismiss five jurors for cause, including Juror 29, Juror 36, Juror 46, Juror 47, and Juror 71. The trial court denied Jackson's cause challenges to those jurors, and Jackson exercised a peremptory strike on each of those jurors. At the close of jury selection, defense counsel renewed the motion for additional peremptory strikes and identified four additional

jurors who were seated that defense counsel would have removed with additional peremptory challenges.  The court denied Jackson's motion.  He now asserts that the trial court erroneously denied challenges to Jurors 2, 15, 29, 36, 46, 47, and 71.  After reviewing the circumstances of each challenge, we find no error by the trial court.

Jurors 2 and 15:  The State and defense counsel agreed to strike both Jurors 2 and 15 for cause because they had been observed sleeping during voir dire.  Although the trial court denied the cause challenge, the State exercised peremptory challenges to remove both of these jurors.  Jackson is not entitled to relief in connection with these challenges because Jackson was not required to expend a peremptory challenge on either of these jurors.  See Busby, 894 So. 2d at 102; Trotter, 576 So. 2d at 693.

Juror 29:  Defense counsel moved to strike Juror 29 for cause because she indicated that she had at least two friends or acquaintances who were victims of homicide, and that one of these incidents involved an individual represented by one of the defense attorneys.  However, Juror 29 indicated that the incidents occurred five and fourteen years ago; she harbored no resentment toward the perpetrators; and she was unlikely to be shocked by gruesome details presented during trial, having previously encountered similar details in those earlier cases.  The trial court

found that Juror 29 indicated that she would be impartial and denied the challenge, and defense counsel exercised a peremptory strike to remove her.

The record supports the trial court's denial of the cause challenge. Each of Juror 29's affirmative responses indicated that she would be impartial in this case. See Banks, 46 So. 3d at 995 ("[I]t does not appear that the juror's unequivocal responses provided any reasonable doubt as to whether the juror possessed an impartial state of mind."). Therefore, we find no merit to Jackson's claim that the trial court improperly denied his cause challenge to this juror.

Juror 36: Defense counsel moved to strike Juror 36 for cause, who had approached the bench several times to privately explain that her aunt had been the victim of murder and attempted sexual battery, and that the defendant in that case was represented by the Public Defender's Office. That defendant pled guilty to murder and received a life sentence. Additionally, Juror 36 indicated that her uncle may have pursued civil litigation involving the death of her aunt, but she was unfamiliar with that matter.

When asked, Juror 36 indicated that she could serve impartially, set any feelings about her aunt aside, and that the present case was different from what had occurred with her aunt. The following interaction occurred during a subsequent bench conference:

> [Juror 36]: This morning when you guys approached me about my situation I was totally caught off guard but I believe I'm a fair

person and I think I could do a [sic] this job even though my situation's kind of a little bit—you know.

The Court: Because of the lawsuit thing?

[Juror 36]: Not the lawsuit but what happened with my aunt in that case. I can't just forget what happened to her and just not give this gentleman a fair chance either. It's not fair at all.

The Court: We discussed that and we had talked about your aunt's situation in front of everybody is that why we're up here?

[Juror 36]: Yeah.

The Court: Based on that do you need to tell us something else about yourself?

[Juror 36]: That I think I could be objective and just concentrate on the evidence and other than that consider all the evidence and not just.

[The State]: Do you think you could give a fair shake to any mitigation they presented would you consider it fairly?

[Juror 36]: Definitely. I would have to that's the only way to be fair.

[The State]: If you felt that it merited great weight of any kind could you assign that weight to it?

[Juror 36]: Yes. I have to be fair on both sides. My situation it's totally nothing to do with this case. I can't just think about that or base my feelings on his situation because it's [a] totally different situation.

The Court: Any questions?

[Defense counsel]: I believe I asked you this earlier today but do you feel like—the facts of this case being somewhat similar and you heard the Judge already say what the charges were if the facts

of this case end up being somewhat similar to the one involving your aunt would you be placed in a very awkward situation trying to be fair to both sides here?

[Juror 36]: No my feelings have nothing to do with this case. I cannot think about my situation, my family's situation. I have to be fair and concentrate on the evidence. That's all.

[The State]: [Juror 36], in the case involving the person who murdered your aunt, there was an agreement whereby he did not receive the death penalty. Were you angry about that?

[Juror 36]: Not at all.

[The State]: You didn't have any care about that at all?

[Juror 36]: No it's not something I think about every day I'm not for or against it. It's not that I'm a cold hearted person but I just have to think about the evidence that's in front of me. And I just need to see what's in front of me and my personal feelings have nothing to do with this at all. My family it's unfortunate what happened to my family but I can't think about that and not be fair to somebody that would be unfair to think about my feelings and what I would do with my family or what we would do. It has nothing to do with this case even though it could be similar. It can't—

[The State]: Do you feel like as you're situated today or this week being here on jury duty and taking a case, the type of case this might be are you saying you want to be on this jury?

[Juror 36]: It's not that I'm eager to be on the jury it just—it's I'm given the chance that's you know I believe I'm meant to be here and that I could do the best job I can for me as a human being I have to have a conscious of what I'm doing and not be guided by my feelings or my situation. It wouldn't be fair. I can never assume.

[Defense counsel]: Okay. So you feel like you could be fair and impartial to both sides in this situation without any kind of he [sic] reservation whatsoever?

- 28 -

[Juror 36]: I believe so and I want to believe that, that would make me a good human being that I can do that you know just think about my personal feelings and my situation. That's not—that be fair.

[Defense counsel]: All right.

[The State]: Understand your response and I understand you say you like to believe you could do that. Are you sure you could do that?

[Juror 36]: I'm pretty sure, yeah. I mean it's going to be hard. I'm not going to sit here and say it's not going—it's not easy for anyone being here in this situation to see the evidence and what we might be exposed to it's totally, I'm a human being of course it's going to be hard but other than my personal feelings I have to be objective and do a good job you know. That's fair.

The court later denied Jackson's cause challenge to Juror 36, and Jackson later exercised a peremptory strike to remove her.

Although Juror 36 was candid about her personal concerns, we conclude that she unequivocally and repeatedly indicated that she would endeavor to be a fair and impartial juror. Her responses are distinguishable from those cases in which this Court has found error in the denial of cause challenges to jurors who repeatedly expressed a lack of impartiality or inability to follow the law. See Matarranz, 133 So. 3d at 477-81, 485-88 (juror repeatedly indicated that she harbored a bias against criminal defendants because she had previously been the victim of a burglary); Kopsho, 959 So. 2d at 170-72 (juror believed that defendant should testify on his own behalf and expressed disagreement with the right to

- 29 -

silence); Overton v. State, 801 So. 2d 877, 890-93 (Fla. 2001) (finding error in denying cause challenge to one juror who emphatically believed that the defendant's failure to testify indicated guilt); see also Welch v. State, 189 So. 3d 296, 301 (Fla. 2d DCA 2016) (holding that jurors who expressed residual doubt about the defendant's right to silence should have been dismissed for cause). Unlike the jurors in Matarranz, Kopsho, Overton, and Welch, Juror 36 did not affirmatively express a bias against Jackson or indicate that he should testify on his behalf.

Instead, we consider our previous analysis in Banks more comparable to these facts. There, the juror in question twice stated that he would be impartial, despite the fact that his daughter had recently been the victim of a robbery. Banks, 46 So. 3d at 995. We concluded that there was no reasonable doubt regarding the juror's impartiality and affirmed the ruling of the trial court. Id. Similarly, the trial court below did not err in denying Jackson's cause challenge to Juror 36.

Jurors 46 and 47: Defense counsel moved to strike Jurors 46 and 47 for cause because defense counsel were concerned that these jurors lacked neutrality on the death penalty. Juror 46 considered herself "smack in the middle" on the issue of the death penalty, indicating that she thought it may be warranted if the murder was premeditated, but she was also interested in considering any mitigating evidence. Juror 47 indicated that he would be slightly in favor of imposing the

death penalty following a conviction of first-degree murder, but said that he would not definitely recommend a sentence of death. The court denied the challenge to Juror 46, finding that she indicated her willingness to be objective, and defense counsel exercised a peremptory strike to remove Juror 46. With respect to Juror 47, the court noted that he was slightly more in favor of a death sentence following a conviction, but found that nothing that Juror 47 said indicated that he would not be fair or impartial and denied the challenge. Defense counsel subsequently exercised a peremptory strike on Juror 47.

When a potential juror is questioned about his or her views on the death penalty, this Court has explained:

> The standard for determining whether a potential juror should be excused for cause based on his view with respect to the imposition of the death penalty is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' "

Overton, 801 So. 2d at 893 (quoting Wainwright v. Witt, 469 U.S. 412, 424 (1985)).

Under this standard, the record supports the trial court's denial of Jackson's cause challenges to both Jurors 46 and 47. Juror 46, who identified herself as "smack in the middle," informed the court and the parties that she would be willing to impose the death penalty under certain circumstances, but she would also consider mitigating evidence. Similarly, although Juror 47 indicated that he held a

- 31 -

slightly less neutral position on the death penalty than Juror 46, this Court has found no error when jurors ultimately state that they would consider both life imprisonment and the death penalty. Id. at 894 (juror indicated that he was inclined to impose death sentences for defendants convicted of first-degree murder, but also explained that he would follow the court's instructions and could entertain a life sentence); Bryant v. State, 656 So. 2d 426, 428 (Fla. 1995) (five jurors initially "expressed strong support of the death penalty," but later indicated that they would follow the instructions and weigh the aggravation and mitigation). Jackson's challenges to these prospective jurors do not merit relief.

Juror 71: Defense counsel moved to dismiss Juror 71 for cause, who asked if it was common for defendants to sit in the room while potential jurors discussed their thoughts about potentially serving on a jury. The court denied the cause challenge, and defense counsel exercised a peremptory challenge to remove her.

However, we do not believe that there was any reasonable doubt as to the impartiality of Juror 71. Her comments were followed by instructions on the right to silence, and the trial court found her questions were innocuous. After she had asked the question, Juror 71 later indicated that she could not yet decide Jackson's guilt at that point in the trial because the State had not yet presented any evidence, which indicated that she understood the instructions regarding the right to silence and presumption of innocence. Her remarks are distinguishable from those cases

- 32 -

in which jurors repeatedly expressed their views that a defendant should testify to demonstrate his or her innocence.  See Kopsho, 959 So. 2d at 170-72; Overton, 801 So. 2d at 891-92.  Therefore, we do not find error in the trial court's denial of Jackson's cause challenge to Juror 71.

Accordingly, Jackson has failed to show that the trial court erroneously denied any of the cause challenges to these prospective jurors.  See Busby, 894 So. 2d at 102; Conde, 860 So. 2d at 941-42; Trotter, 575 So. 2d at 693.  Because we do not believe the trial court erred in any of these denials, we cannot conclude that the trial court abused its discretion when it declined to grant additional peremptory challenges, even acknowledging the difficulties encountered in seating this jury.[4] Therefore, Jackson's as-applied challenge to the constitutionality of section 913.08 also fails.

Motion for Mistrial

Jackson also asserts that the trial court improperly denied his motion for mistrial raised during the State's direct examination of Linda O'Neal.  During trial, the State presented evidence from Linda, who was the wife of Wallace O'Neal. Wallace was the former boyfriend of Jackson's grandmother, and Jackson had

---

4. The initial attempt to seat a jury in this case failed.  Additionally, during voir dire, one juror was admonished and dismissed because he had researched Jackson online, and another was released after expressing concern that her brother shared the same name as Jackson.

lived with Wallace and his grandmother from the time that Jackson was three years old until his grandmother passed away. When the State attempted to elicit testimony from Linda regarding the time when Jackson moved in with her and Wallace, the following exchange occurred:

> [The State]: And prior to September 13th of 2007, how long approximately did [Jackson] live with you at the Grand View Mobile Home Park with you and Wally?
>
> [O'Neal]: I believe he was released—

At that point, defense counsel objected, and during a subsequent bench conference, defense counsel moved for a mistrial, which the trial court denied. The trial court instructed Linda to provide only "yes" or "no" answers. The State then attempted to ask Linda whether Jackson maintained a steady job, and when Linda began to answer with a more complex answer beyond "yes" or "no," defense counsel moved for another bench conference, and the court dismissed the jury from the courtroom. The following exchange occurred:

> The Court: Ms. O'Neal, you came within a quarter inch of destroying this entire trial.
> Weren't you told not to make any mention of that? Were you told not to make mention of that, yes or no?
>
> [O'Neal]: Of what?
>
> The Court: Of this young man being released from prison.
>
> [The State]: That he was in prison or jail.
>
> [O'Neal]: Yes.

The Court: And why in the world would you mention that or come close to mentioning it?

[O'Neal]: Because I couldn't figure—I couldn't remember when he was released. I couldn't remember when he was released, and that's when he came to my house. I don't remember.

Following the end of Linda's testimony, defense counsel renewed its motion for mistrial, adding that Linda had "burst openly into tears" when she was asked about the death of her husband. The State strongly disagreed with that characterization and argued that her eyes watered up, but she did not lose her composure. The trial court made no factual findings regarding Linda's emotional state and denied the motion. Jackson now asserts that the denial of his motion for mistrial was erroneous.

A trial court should grant a motion for mistrial only if prejudicial error occurs that vitiates the entire trial. England v. State, 940 So. 2d 389, 401-02 (Fla. 2006) (citing Snipes v. State, 733 So. 2d 1000, 1005 (Fla. 1999)). We review trial court rulings regarding motions for a mistrial for abuse of discretion. Id. at 402 (citing Perez v. State, 919 So. 2d 347 (Fla. 2005)). This standard is satisfied only if no reasonable person would arrive at the same conclusion as that of the trial court. Trease v. State, 768 So. 2d 1050, 1053 n.2 (Fla. 2000) (citing Huff v. State, 569 So. 2d 1247, 1249 (Fla. 1990)).

- 35 -

Although irrelevant evidence of prior criminal activity is presumptively harmful, see Straight v. State, 397 So. 2d 903, 908 (Fla. 1981), an isolated or stray reference to a defendant's prior incarceration is considered in context of the trial and does not necessarily result in a mistrial. See Fletcher v. State, 168 So. 3d 186, 207 (Fla. 2015), cert. denied, 136 S. Ct. 980 (2016). When determining whether such a remark vitiated the defendant's right to a fair trial, reviewing courts have often considered whether the fact of a prior conviction or incarceration was critical to any facts at issue during the trial. Compare Cox v. State, 819 So. 2d 705, 713-14 (Fla. 2002) (finding no abuse of discretion by trial court's denial of motion for mistrial after witness stated that the defendant already had two sentences of life imprisonment because the jury was aware that the defendant was incarcerated at the time of the events in question) with Brooks v. State, 868 So. 2d 643, 644-48 (Fla. 2d DCA 2004) (holding that witness's suggestion that the defendant "went back to prison" was harmful in part because it affected the defense's theory of self-defense, which would have been undermined in light of evidence of a prior conviction); and Henderson v. State, 789 So. 2d 1016, 1017-18 (Fla. 2d DCA 2000) (concluding that witness's statement that the defendant seemed familiar with criminal activity as though he had "done this before" was harmful because the character of the defendant was a central issue in that case); see also Fletcher, 168 So. 3d at 208 (rejecting claim that a mistrial was warranted in light of inadvertent

references to the defendant's prior incarceration because the defendant was charged with escape and stipulated to the fact that he was in lawful custody at the time of that escape).

Jackson has not satisfied the heavy burden of proving that the trial court abused its discretion when it denied his motion for mistrial after Linda's very limited comment. Because she did not indicate where Jackson had been released from, it was plausible that the jury could have inferred that he had been released from a hospital or from military service. The record in this case indicates that Linda was a nonresponsive witness who required multiple instructions from the trial court. Contrary to Jackson's assertions, her limited, stray remark does not rise to the level of the improper admission of Williams[5] rule evidence.

Moreover, the cases upon which Jackson relies for support of his argument are distinguishable. The district court in Brooks held that the remark that the defendant had been "sent back to prison" was harmful because the defendant had been charged with domestic violence and had relied on a theory of self-defense. 868 So. 2d at 644-46. That court concluded that the comment would have been understood by the jury as a relevant consideration, would have undermined the defense's theory of self-defense, and required defense counsel to present the

---

5. Williams v. State, 110 So. 2d 654 (Fla. 1959).

- 37 -

defendant to testify on his own behalf, which exposed him to impeachment. Id.; see also Henderson, 789 So. 2d at 1018 ("In this case . . . character was a central issue."). By contrast, Jackson did not assert self-defense, and his character was not an issue in dispute. Likewise, Finklea v. State, 471 So. 2d 596, 597 (Fla. 1st DCA 1985), is distinguishable because the witness in that case indicated that the defendant had previously been involved in two robberies. Linda's limited, vague comment about Jackson having been released was not similar to the affirmative statement regarding the defendant's prior involvement in two specific crimes in Finklea.

Further, we reject Jackson's various claims that this comment undermined other aspects of his trial. He claims that the comment was exacerbated by the previous testimony of Iris Williams, who thought it was unusual to see Jackson in Gibsonton when she knew he lived with the O'Neals in Seffner. However, Williams testified that although she knew the O'Neals well, she did not know Jackson well and had only met him on two or three occasions. We also do not agree that Linda's emotional response—the extent of which was disputed—when asked about the death of her husband had any effect on her earlier comment that Jackson had been released.

We also do not find persuasive the suggestion that the comment affected the jury. Jackson claims that the prejudice is obvious given that several jurors were

dismissed during trial. One prospective juror was dismissed because he researched Jackson on the Internet during voir dire. However, this juror was dismissed a week before Linda testified, and the trial court inquired whether that juror spoke to any other jurors about his research, which he had not. Additionally, prior to Linda's testimony, Juror 89 was released by agreement of the parties after he had approached the bench earlier that day and explained that he suffered a severe fear of heights that was exacerbated by the location of the particular courtroom used in this trial. Jackson also asserts prejudice existed when Juror 10 asked to be excused because she was concerned that she would no longer be able to fairly evaluate the evidence. However, Juror 10 was excused during the penalty phase—over a week after Linda testified and after the jury had convicted Jackson. The record also indicates that Juror 10 informed the court that she became emotional after hearing mitigating evidence about Jackson's difficult childhood in relation to her own young son. In reviewing the effect of the stray remark by Linda O'Neal within the context of this trial, we conclude that the trial court did not abuse its discretion when it denied Jackson's motion for mistrial.

## Admission of Post-Mortem Photographs

Jackson next asserts that the trial court improperly permitted the admission of gruesome post-mortem photographs of Tran that he claims were irrelevant because Tran was dead before the fire started. This Court will not disturb a trial

- 39 -

court's ruling on the admissibility of photographic evidence absent an abuse of discretion. Dennis v. State, 817 So. 2d 741, 763 (Fla. 2002). We have held that photographs are admissible if they are relevant and if the shocking nature of the photographs does not outweigh their relevance. Jennings v. State, 123 So. 3d 1101, 1126 (Fla. 2013) (citing Hertz v. State, 803 So. 2d 629, 641 (Fla. 2001); Czubak v. State, 570 So. 2d 925, 928 (Fla. 1990)). We have previously approved the admission of crime scene photographs that were relevant to the manner of the murder or depict the victim as discovered by law enforcement. Douglas v. State, 878 So. 2d 1246, 1255-56 (Fla. 2004); see also Hertz, 803 So. 2d at 642 n.7 (explaining that crime scene photographs of victims whose bodies were burned were relevant to show, among other matters, how damage from the fire hampered the forensic investigation). When the State seeks to admit autopsy photographs of a victim, the photographs must be relevant to an issue in dispute. Almeida v. State, 748 So. 2d 922, 929 (Fla. 1999). Autopsy photographs may also be relevant when they assist the medical examiner in explaining the victim's injuries or manner of death. Hertz, 803 So. 2d at 642 (citing Mansfield v. State, 758 So. 2d 636, 648 (Fla. 2000); Pope v. State, 679 So. 2d 710, 714 (Fla. 1996)). Nonetheless, we have urged trial courts to proceed with caution to ensure that the photographs are not impermissibly prejudicial or inflammatory. Jennings, 123 So. 3d at 1127; Marshall v. State, 604 So. 2d 799, 804 (Fla. 1992); see also Larkins v. State, 655 So. 2d 95,

98 (Fla. 1995) ("While a trial court should exercise caution in admitting particularly gruesome photographs, and in limiting their numbers, such photographs may still be relevant."). This Court reviews the erroneous admission of photographs for harmless error. See Hertz, 803 So. 2d at 643.

In Hertz, this Court reviewed the relevance of several crime scene and autopsy photographs that had been admitted during trial. 803 So. 2d at 641. We concluded that a crime scene photograph that depicted the victims' charred corpses as discovered by law enforcement was relevant to explain: (1) the condition in which the bodies were found; (2) that the victims were killed execution-style; (3) how the position of the bodies preserved clothing for testing for accelerants; (4) the manner in which the accelerant was applied; and (5) how the fire itself interfered with the forensic investigation. Id. at 641-42 & n.7. We also independently noted that the photograph was probative of the avoid arrest aggravating circumstance found in that case. Id. at n.7. We ultimately concluded that the erroneous admission of other autopsy photographs was harmless in light of the extensive evidence of Hertz's guilt. Id. at 643; see also Doorbal v. State, 983 So. 2d 464, 498-99 (Fla. 2008) (noting that trial court abused its discretion when it admitted a photograph that was only relevant to show the rate of decomposition of the victim's body, but finding the error harmless).

During trial, the court conducted a bench conference to permit the State to explain how the medical examiner, Dr. Sheil, expected to rely on photographs Q1-17 during her testimony. Exhibits Q1 and Q2 depicted the full length of Tran's body after suffering heat amputation, but were taken from different sides. Exhibits Q3, Q4, Q5, Q6, and Q7 were photographs of Tran's face and neck, including the injuries to her throat, taken from different angles. Exhibit Q8 presented the extent of thermal injury to her body. Exhibits Q9, Q10, Q12, and Q13 indicated injuries to Tran's left hand, including a suspected defensive wound. Exhibit Q11 was a photograph of debris recovered near Tran's body. Exhibit Q14 was a photograph of bones recovered from the van. Exhibits Q15, Q16, and Q17 included photographs of the victim's pharynx and trachea.

During voir dire, Dr. Sheil indicated that Exhibits Q1-Q5 were necessary to explain the victim's injuries. She also stated that Q9 and Q10 depicted defensive injuries to Tran's hand, but admitted that it was difficult to identify that injury in Q10. She indicated that she would need to explain the thermal injuries so that the jury could understand why Tran's injuries appeared the way they did and that the thermal injuries may have obscured other injuries that Tran might have received. She added that the photographs of Tran's larynx and trachea were relevant to prove that Tran had not inhaled smoke before she died.

Following the voir dire of Dr. Sheil, defense counsel withdrew their objections to Exhibits Q11, Q12, Q14, and Q16. The trial court found that the photographs were not cumulative, although some of the photographs depicted the same image from different angles. The court concluded that the photographs were relevant to show that Jackson attempted to destroy evidence of Tran's murder, found that the photographs were not unduly prejudicial, and admitted them. Jackson now specifically challenges the admission of Exhibits Q3, Q4, and Q5 as repetitive, as well as Q6, Q9, and Q10. See Appellant's Initial Br. 71.[6]

We conclude that the trial court correctly determined that Exhibits Q3, Q4, Q5, and Q6 were relevant to show the fatal injuries that Tran suffered. Dr. Sheil extensively discussed these photographs as she described for the jury the six wounds that ultimately resulted in Tran's death. At least three of these wounds would have been fatal, and one of the wounds would have silenced Tran. Thus, the photographs of these wounds were relevant to the cause of death and were necessary for Dr. Sheil's testimony. Moreover, the nature of Tran's wounds was

_____

6. To the extent that Jackson contends that any of the remaining photographs were irrelevant and unduly prejudicial, he has failed to sufficiently brief such an argument. See Heath, 3 So. 3d at 1029 n.8 ("Vague and conclusory allegations on appeal are insufficient to warrant relief."). Further, any potential error regarding the admission of Exhibits Q11, Q12, Q14, and Q16 was waived when trial counsel withdrew their objections to these exhibits. See Simmons v. State, 934 So. 2d 1100, 1111 n.12 (Fla. 2006).

- 43 -

also relevant to the HAC aggravating circumstance, which was an issue during the penalty phase. See Boyd v. State, 910 So. 2d 167, 191-92 (Fla. 2005) (noting the admissibility of one photograph was questionable, but ultimately finding no abuse of discretion because the photograph assisted the medical examiner's testimony and was relevant to establish the HAC aggravating circumstance).

Further, we do not find any abuse of discretion in admitting multiple photographs of the same or similar image. Admittedly, the State might have been able to elicit the same testimony from Dr. Sheil through the admission of one or two, rather than four, photographs. See Douglas, 878 So. 2d at 1256 (noting that the prosecution admitted only one photograph of each injured area of the victim's body). However, we have previously approved the admission of multiple gruesome photographs. See Arbelaez v. State, 898 So. 2d 25, 44 (Fla. 2005) (concluding that the trial court did not abuse its discretion when it admitted four photographs of the victim's body after it had been recovered and six autopsy photographs that showed various injuries from different angles); Douglas, 878 So. 2d at 1255-56 (finding no abuse of discretion in admitting thirteen autopsy photographs). Therefore, we cannot say that no reasonable jurist would have admitted Exhibits Q3, Q4, Q5, and Q6.

Moreover, we find no abuse of discretion in the admission of Exhibits Q9 or Q10. These exhibits depicted injuries that Dr. Sheil opined were defensive wounds

to Tran's hands, which were relevant to the HAC aggravating circumstance. See Williams v. State, 37 So. 3d 187, 200 (Fla. 2010); Boyd, 910 So. 2d at 191-92. Therefore, the trial court did not err in admitting these photographs.

We also reject Jackson's suggestion that the gruesome nature of the photographs had an obvious prejudicial effect on the jury, as Jurors 10 and 89 were released following the admission of these photographs. However, as explained above, the record indicates that these jurors were excused from the panel for reasons that were entirely unconnected to the admission of these photographs.

The post-mortem photographs of Tran were undeniably difficult, as one would expect photographs of a victim's body damaged by fire to be. However, the photographs at the focus of Jackson's argument were the photographs that depicted the fatal wounds and defensive wounds that Tran incurred before she died. Although it was undisputed that Tran had died before the fire was started, the State was still burdened with presenting evidence regarding the cause of Tran's death. Additionally, the HAC aggravating circumstance, which can be established by evidence of multiple stabbings and defensive wounds, was an issue in dispute in this trial. Although these photographs were undoubtedly adverse to Jackson, they cannot be said to be so unduly prejudicial that their admission was unfair. See Dollar v. Long Mfg., N.C., Inc., 561 F.2d 613, 618 (5th Cir. 1977) ("Virtually all evidence is prejudicial or it isn't material. The prejudice must be 'unfair.' "). We

cannot conclude that the trial court abused its discretion here, particularly in light of the lengthy voir dire of Dr. Sheil to explain the purpose of these photographs before the jury was permitted to view them. We reject Jackson's claim.

Sufficiency

Although Jackson does not raise this argument, when a defendant is sentenced to death, we have an independent obligation to review the record for competent, substantial evidence that supports the defendant's convictions. E.g., Brown v. State, 143 So. 3d 392, 407 (Fla. 2014) (citing Blake v. State, 972 So. 2d 839, 850 (Fla. 2007); Fla. R. App. P. 9.142(a)(5)). If a rational trier of fact may conclude, upon a review of the evidence in the light most favorable to the State, that the elements of the crime have been proven beyond a reasonable doubt, we will affirm the convictions. Id.

There is both direct and circumstantial competent, substantial evidence in this record to support Jackson's convictions. A confession constitutes direct evidence of guilt in Florida. Simmons, 934 So. 2d at 1111. Jackson admitted to Gonzalez and Kennedy that he knew Tran would jog regularly in their neighborhood. He told them that he stole the van, encountered Tran, raped her, and stabbed her in the throat. Kennedy testified that Jackson waited for Tran and indeed relished his encounter with her, telling Kennedy that "he fucked her good." The State also presented competent, substantial circumstantial evidence of

- 46 -

Jackson's guilt, including the fact that his DNA was found in Tran's vagina. Witness testimony and surveillance footage placed Jackson in Seffner, near the location where the van was stolen early in the morning of September 13, and later in Gibsonton, where the burning van was discovered. Linda O'Neal testified that Jackson returned home to Seffner around 1:00 or 1:30 p.m., on foot and sweating. Additionally, Detective Pettis explained that the van appeared to have been stolen, based on the notch observed on the van's door handle. Randy St. Clair of the State Fire Marshal's Office testified that he believed that the van was set on fire to conceal the evidence of Tran's murder. Thus, we are satisfied that competent, substantial evidence supports Jackson's convictions.

**Penalty Phase**

Jackson asserts that several errors occurred during the penalty phase of his trial, including: (1) Florida's capital sentencing statute violates the Sixth and Eighth Amendments under <u>Hurst v. Florida</u> and <u>Ring v. Arizona</u>, 536 U.S. 584 (2002); (2) the trial court should have considered qEEG evidence during the penalty phase; (3) the jury should not have been given instructions on the CCP aggravating circumstance; (4) the trial court permitted improper rebuttal testimony from a witness who testified on behalf of the State; and (5) the HAC and felony murder aggravating circumstances are unconstitutional. We only address the issue that we find dispositive, that Jackson's sentence violates the Sixth Amendment

- 47 -

under <u>Hurst v. Florida</u>.  Because we conclude that Jackson is entitled to a new penalty phase, we decline to address his remaining claims.

<u>The Sixth Amendment under Apprendi, Ring, and Hurst v. Florida</u>

In recent years, the United States Supreme Court has become increasingly focused on the intersection between criminal sentencing and the right to a jury trial as guaranteed by the Sixth Amendment.  In <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000), the Court considered whether the Sixth Amendment permitted factfinding by a judge, not a jury, on a matter that increased the maximum sentence for a given offense.  The Court had previously held that the Due Process Clause of the Fifth Amendment and the Sixth Amendment right to a jury trial required that any fact that "increase[d] the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt."  <u>Id.</u> at 476 (quoting <u>Jones v. United States</u>, 526 U.S. 227, 243 n.6 (1999)).  In <u>Apprendi</u>, the Court applied that right to state criminal law via the Due Process Clause of the Fourteenth Amendment.  <u>Id.</u>  However, the <u>Apprendi</u> Court noted one exception to this rule: a jury is not required to make factual findings that the defendant has a prior conviction.  <u>Id.</u> at 487-90 (citing <u>Almendarez-Torres v. United States</u>, 523 U.S. 224 (1998)).

The Court expanded <u>Apprendi</u> to capital punishment in <u>Ring</u>.  536 U.S. at 609.  In Arizona, a defendant convicted of first-degree murder could not be

sentenced to death without a separate sentencing procedure that followed his or her conviction and that entailed additional factual findings by a judge. Id. at 592. The judge alone conducted a sentencing hearing to make factual findings regarding the existence of aggravating and mitigating circumstances, and the judge was only authorized to sentence a defendant to death if at least one aggravating circumstance was proven and "there [were] no mitigating circumstances sufficiently substantial to call for leniency." Id. at 592-93 (citing § 13-703(F), Ariz. Rev. Stat. Ann. (West. Supp. 2001)). The Supreme Court held that this procedure was unconstitutional because it removed from the jury the factfinding process that exposed the defendant to an increased punishment, which could not be supported under Apprendi. Id. at 609.

This Court initially concluded that Ring did not apply to Florida. E.g., Johnson v. State, 904 So. 2d 400, 406 (Fla. 2005) (citing Bottoson v. Moore, 833 So. 2d 693 (Fla. 2002); King v. Moore, 831 So. 2d 143 (Fla. 2002)). Bottoson and King were both plurality opinions that concluded that Ring did not apply to Florida because the Supreme Court had previously affirmed Florida's capital sentencing process—notably in Hildwin v. Florida, 490 U.S. 638, 640 (1989), and Spaziano v. Florida, 468 U.S. 447 (1984)—and did not expressly overrule these decisions following Ring. Bottoson, 833 So. 2d at 695 n.4; King, 831 So. 2d at 144 n.4. Additionally, Justices Harding, Wells, Quince, Anstead, Shaw, Pariente, and Lewis

wrote separate opinions in Bottoson, reflecting the deep divisions among the Court regarding the application of Ring. See generally 833 So. 2d 693. Although neither Bottoson nor King constituted majority decisions that represented a clear rule of law from this Court, the ultimate result was that Ring was never applied in this State. See, e.g., Hurst v. State (Hurst), 147 So. 3d 435, 446-47 (Fla. 2014), rev'd, Hurst v. Florida, 136 S. Ct. 616.

Consistent with that precedent, this Court did not grant Hurst relief pursuant to Ring. Hurst, 147 So. 3d at 446. Hurst was resentenced to death following a jury recommendation of seven to five in favor of a death sentence. Id. at 445. His trial counsel requested an interrogatory verdict to specify the aggravating circumstances, which included HAC and the fact that the murder was committed during the course of a robbery, but the trial court denied the request. Id. at 440, 446 n.4. This Court rejected Hurst's claim that Ring required the jury to find the existence of these aggravating circumstances, especially in light of the fact that Hurst had no prior felony conviction, and the jury that recommended his current sentence was not the same jury that convicted him of murder. Id. at 446.

The Supreme Court accepted certiorari jurisdiction and reversed, holding that Ring applies to Florida's capital sentencing statute. Hurst v. Florida, 136 S. Ct. at 619. As was the case in Arizona under Ring, a conviction of first-degree murder alone did not subject a defendant to a potential sentence of death;

additional sentencing procedures were necessary to impose a death sentence. Id. at 620 (citing §§ 782.04(1)(a), 775.082(1), Fla. Stat. (2010)). The sentencing procedure employed in Florida involved the presentation of aggravating and mitigating circumstances to a jury, which then made a recommendation of sentence to the judge, who later made factual findings as to the aggravation, mitigation, and relative weight of each. Id.; see § 921.141, Fla. Stat. (2007). The Supreme Court held that any distinctions between Florida's sentencing statute and that at issue in Ring—such as the fact that in Arizona, there was no jury participation after the conviction—were irrelevant and concluded that Florida's statute was also unconstitutional:

> Had Ring's judge not engaged in any factfinding, Ring would have received a life sentence. Ring, 326 U.S. at 597. Ring's death sentence therefore violated his right to have a jury find the facts behind his punishment.
>     The analysis the Ring Court applied to Arizona's sentencing scheme applies equally to Florida's. Like Arizona at the time of Ring, Florida does not require the jury to make the critical findings necessary to impose the death penalty. Rather, Florida requires a judge to find these facts. [§ 921.141(3), Fla. Stat.]. Although Florida incorporates an advisory jury verdict that Arizona lacked, we have previously made clear that this distinction is immaterial . . . .
>         . . . .
> Florida's sentencing scheme, which required the judge alone to find the existence of an aggravating circumstance, is therefore unconstitutional.

Hurst v. Florida, 136 S. Ct. at 621-24.

The Court rejected each of the arguments advanced by Florida in support of its sentencing statute.  First, it concluded that the advisory verdict rendered by the jury did not satisfy the factfinding requirement of the Sixth Amendment as articulated in Ring.  Id. at 622.  Additionally, the Court explained that Hurst did not admit the existence of any aggravating circumstance, rejecting the State's suggestion that Hurst waived any subsequent Ring claim.  Id. at 623.  The Court further concluded that stare decisis was an insufficient barrier to deny Hurst relief and explicitly overruled Spaziano and Hildwin after noting that it has refused to recognize stare decisis in similar cases under Apprendi.  Id. at 623-24.  Finally, the Supreme Court remanded to this Court to determine whether any error in Hurst's sentence was harmless.  Id. at 624.

Justice Breyer concurred in the judgment, concluding that the Eighth Amendment, rather than the Sixth Amendment, required a jury to sentence a defendant to death.  Id. (Breyer, J., concurring in the judgment).  Justice Alito dissented, questioning the basis for overruling Hildwin and Spaziano.  Id. at 624-27 (Alito, J., dissenting).  Further, Justice Alito wrote that any error that occurred during Hurst's resentencing was harmless beyond a reasonable doubt.  Id. at 626.

On remand from the Supreme Court in Hurst v. State, we held that "the Supreme Court's decision in Hurst v. Florida requires that all the critical findings necessary before the trial court may consider imposing a sentence of death must be

found unanimously by the jury." Hurst v. State (Hurst v. State), 202 So. 3d 40, 44 (Fla. 2016), petition for cert. filed, No. 16-998 (U.S. Feb. 13, 2017). We explained:

> In capital cases in Florida, these specific findings required to be made by the jury include the existence of each aggravating factor that has been proven beyond a reasonable doubt, the finding that the aggravating factors are sufficient, and the finding that the aggravating factors outweigh the mitigating circumstances.

Id. We further held, based on Florida's separate right to trial by jury under article I, section 22, of the Florida Constitution, "Florida's requirement for unanimity in jury verdicts, and under the Eighth Amendment to the United States Constitution, that in order for the trial court to impose a sentence of death, the jury's recommended sentence of death must be unanimous." Id. Finally, we determined that Hurst error is capable of harmless error review. Id. at 67. In considering this case, we once again explain Hurst v. Florida's application in holding that Jackson is entitled to a new penalty phase.

Whether an Error Occurred in This Case

New rules of law announced by the United States Supreme Court or this Court will apply to all cases that are pending on direct review or are otherwise not finalized. State v. Johnson, 122 So. 3d 856, 861 (Fla. 2013) (citing Griffith v. Kentucky, 479 U.S. 314, 328 (1986); Smith v. State, 598 So. 2d 1063, 1066 (Fla.

- 53 -

1992)).  This case is before us on direct appeal; therefore, Jackson's appeal is subject to Hurst v. Florida.

Jackson and the State dispute the scope of Hurst v. Florida.  Jackson asserts that Hurst v. Florida requires unanimous jury findings that the aggravation outweighs the mitigation before a defendant can be sentenced to death, while the State insists that the jury must only find the existence of a single aggravating circumstance before death can be imposed.  The State argues that Jackson's sentence was unaffected by Hurst v. Florida because Jackson was simultaneously convicted of sexual battery, and the aggravating factor that the murder was committed during the course of a sexual battery was found in this case.  On this point, we agree with Jackson that a jury must find that sufficient aggravating circumstances exist and that these aggravating circumstances outweigh any mitigating circumstances.

Ring and Hurst v. Florida simply state that the jury must find "any fact on which the legislature conditions an increase in the maximum punishment."  Hurst v. Florida, 136 S. Ct. at 620; Ring, 536 U.S. at 588.  Those facts that permit the authorization of a death sentence are a matter of state law.  See Hurst v. Florida, 136 S. Ct. at 619 ("Florida law required the judge to hold a separate hearing and determine whether sufficient aggravating circumstances existed to justify imposing the death penalty. . . .  We hold this scheme unconstitutional.  The Sixth

Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death." (emphasis added)); Ring, 536 U.S. at 588 ("In Arizona . . . the trial judge, sitting alone, determines the presence or absence of the aggravating factors required by law for imposition of the death penalty.").

To determine whether Jackson's sentence violated Hurst v. Florida, we discuss only the statutes in effect at the time his sentence was issued, which were sections 775.082(1) and 921.141, Florida Statutes (2007).[7] These statutes detailed the following procedures:

> A person who has been convicted of a capital felony shall be punished by death if the proceeding held to determine sentence according to the procedure set forth in s. 921.141 results in findings by the court that such person shall be punished by death, otherwise such person shall be punished by life imprisonment and shall be ineligible for parole.

§ 775.082(1), Fla. Stat. (2007) (emphasis supplied).

> (1) Separate proceedings on issue of penalty.—Upon conviction or adjudication of guilt of a defendant of a capital felony, the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death or life imprisonment as authorized by s. 775.082. . . .

> (2) Advisory sentence by the jury.—After hearing all the evidence, the jury shall deliberate and render an advisory sentence to the court, based upon the following matters:

---

7. These statutes were significantly amended by the Florida Legislature in its 2016 and 2017 terms following the decisions in Hurst v. Florida and Hurst v. State. See Ch. 2016-13, § 13, Laws of Fla.; Ch. 2017-1, § 1, Laws of Fla.

- 55 -

(a) Whether <u>sufficient</u> aggravating circumstances exist as enumerated in subsection (5);

(b) Whether <u>sufficient mitigating circumstances exist which outweigh the aggravating circumstances</u> found to exist; and

(c) Based on these considerations, whether the defendant should be sentenced to life imprisonment or death.

(3) Findings in support of sentence of death.—Notwithstanding the recommendation of a majority of the jury, the court, after weighing the aggravating and mitigating circumstances, shall enter a sentence of life imprisonment or death, but if the court imposes a sentence of death, it shall set forth in writing its findings upon which the sentence of death is based as to the facts:

(a) That <u>sufficient</u> aggravating circumstances exist as enumerated in subsection (5); <u>and</u>

(b) <u>That there are insufficient mitigating circumstances to outweigh the aggravating circumstances</u>.

§ 921.141(1)-(3), Fla. Stat. (2007) (emphasis added).  Our review of these statutes leads to the conclusion that the facts that were necessary to impose the death penalty in Florida at the time that Jackson was sentenced are those highlighted in section 921.141(3)(a)-(b): that <u>sufficient aggravating circumstances</u> exist <u>and</u> the existing <u>aggravation outweighs the presented mitigation</u>.  These are the facts that must be found by a jury under <u>Hurst v. Florida</u>.

Accordingly, we must reject the State's argument that no <u>Hurst v. Florida</u> error occurred because Jackson was simultaneously convicted of sexual battery and the felony murder aggravating circumstance was found below.  We recognize that

we have previously refused to apply Ring when a defendant is convicted both of felony murder and the predicate felony, or when the jury has necessarily found facts that support a judge's finding of an aggravating circumstance. See, e.g., Ellerbee v. State, 87 So. 3d 730, 747 (Fla. 2012) (citing Baker v. State, 71 So. 3d 802, 824 (Fla. 2011); Douglas, 878 So. 2d at 1263-64). However, Hurst v. Florida has indicated that a great deal of our previous Ring jurisprudence requires reconsideration, including our understanding of the previous version of section 921.141, which we now believe required findings of "sufficient" aggravating circumstances—not just a single aggravating circumstance, as the State claims. See also Barclay v. Florida, 463 U.S. 939, 954 n.12 (1983) (noting that the language in section 921.141 pertaining to "sufficient aggravating circumstances" suggests that the finding of one aggravating circumstance alone does not necessarily support the imposition of a death sentence).

As a predicate for Jackson's sentence to have been constitutional under Hurst v. Florida, the jury would have been required to find that sufficient aggravating circumstances existed, and that sufficient aggravating circumstances outweighed the mitigating circumstances. This did not occur. The jury in this case did not make any factual findings, but merely recommended by a vote of eleven to one that Jackson be sentenced to death. To the extent that the jury's recommendation can be understood as a proxy for the necessary factual findings—

a matter that the United States Supreme Court cautioned against[8]—at least one juror apparently concluded either that sufficient aggravating circumstances did not exist, that the mitigation outweighed the aggravation, or both. Therefore, Jackson's sentence violated the Sixth Amendment under Ring and Hurst v. Florida.

The Nature of a Hurst Error: Structural or Potentially Harmless

Having established that Jackson's sentence was unconstitutional, we next consider the nature of the error. Jackson asserts that a Hurst v. Florida error cannot be subject to harmless error review, but instead should be considered a structural error that requires relief. We disagree that a Hurst v. Florida error, which pertains to the entity that makes factual findings regarding an individual's eligibility for the death penalty, falls within the "very limited class of cases" that require reversal. Neder v. United States, 527 U.S. 1, 8 (1999). Instead, we agree with the State that such errors are capable of harmless error review.

The United States Supreme Court has explained that "most constitutional errors can be harmless." Arizona v. Fulminante, 499 U.S. 279, 306 (1991). However, it has recognized that there are certain errors that can never be harmless:

> [W]e have found an error to be "structural," and thus subject to automatic reversal, only in a "very limited number of cases." Johnson v. United States, 520 U.S. 461, 468 (1997) (citing Gideon v.

---

8. Hurst v. Florida, 136 S. Ct. at 622 ("The State cannot now treat the advisory recommendation by the jury as the necessary factual finding that Ring requires.").

Wainwright, 372 U.S. 335 (1963) (complete denial of counsel); Tumey v. Ohio, 273 U.S. 510 (1927) (biased trial judge); Vasquez v. Hillery, 474 U.S. 254 (1986) (racial discrimination in selection of grand jury); McKaskle v. Wiggins, 465 U.S. 168 (1984) (denial of self-representation at trial); Waller v. Georgia, 467 U.S. 39 (1984) (denial of public trial); Sullivan v. Louisiana, 508 U.S. 275 (1993) (defective reasonable-doubt instruction)).

The error at issue here—a jury instruction that omits an element of the offense—differs markedly from the constitutional violations we have found to defy harmless-error review. Those cases, we have explained, contain a "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." Fulminante, [499 U.S.] at 310. Such errors "infect the entire trial process," Brecht v. Abrahamson, 507 U.S. 619, 630 (1993), and "necessarily render a trial fundamentally unfair," Rose[ v. Clark, 478 U.S. 570, 577 (1986)]. Put another way, these errors deprive defendants of "basic protections" without which "a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . and no criminal punishment may be regarded as fundamentally fair." Id., at 577-578.

Neder, 527 U.S. at 8-9. The Court concluded that the error in Neder did not automatically render the defendant's trial fundamentally unfair and ultimately found that the error in that case was harmless. Id. at 9, 20.

Although the United States Supreme Court has not explicitly held that Ring errors are capable of harmless error review, it has held that similar errors can be harmless. See Washington v. Recuenco, 548 U.S. 212, 221-22 (2006). In Blakely v. Washington, 542 U.S. 296, 303 (2004), a noncapital defendant was sentenced to a term that exceeded the statutory maximum of the standard range of the offense "because he had acted with 'deliberate cruelty.' " Relying on Apprendi and Ring, the Supreme Court held that the sentence violated the Sixth Amendment. Id. at

303-05. Subsequently, the Court reversed a decision from the Washington Supreme Court that a Blakely error was a fundamental error incapable of harmless error review. Recuenco, 548 U.S. at 222; see also United States v. Cotton, 535 U.S. 625, 632 (2002) (reviewing an Apprendi error for plain error under Federal Rule of Criminal Procedure 52(b) and concluding that "the error did not seriously affect the fairness, integrity, or public reputation of judicial proceedings").

Moreover, the vast majority of jurisdictions that have addressed the issue have determined that a Ring error is capable of harmless error review. See, e.g., United States v. Allen, 406 F.3d 940, 948 (8th Cir. 2005); United States v. Davis, 380 F.3d 821, 830 (5th Cir. 2004); United States v. Higgs, 353 F.3d 281, 306 (4th Cir. 2003); Ex parte Stephens, 982 So. 2d 1148, 1153 (Ala. 2006); State v. Ring (Ring II), 65 P.3d 915, 933 (Ariz. 2003); People v. Williams, 233 P.3d 1000, 1040-41 (Cal. 2010); Capano v. State, 889 A.2d 968, 977 (Del. 2006); State v. Lovelace, 90 P.3d 298, 300 (Idaho 2004); State v. Whitfield, 107 S.W.3d 253, 262 (Mo. 2003); State v. Jordan, 325 S.W.3d 1, 70 (Tenn. 2010). Additionally, the Supreme Court remanded Hurst v. Florida to this Court to determine whether the Sixth Amendment violation in Hurst's case was harmless. Hurst v. Florida, 136 S. Ct. at 624.

We see no reason to abandon the majority rule or the guidance of the Supreme Court in Recuenco by holding that a Hurst v. Florida error is

fundamental. A <u>Hurst v. Florida</u> error emerges because a judge, rather than a jury, makes findings regarding the facts that render a defendant eligible for a death sentence. See <u>Hurst v. Florida</u>, 136 S. Ct. at 619. The error here did not occur because <u>no</u> findings were made, but rather because <u>the jury</u> did not make the findings as required by the Sixth Amendment. Such an error does not constitute "a defect affecting the framework" of the trial to the extent that any resulting sentence must be deemed fundamentally unfair. <u>Neder</u>, 527 U.S. at 8 (quoting <u>Fulminante</u>, 499 U.S. at 310). Therefore, we hold that a <u>Hurst v. Florida</u> error is capable of harmless error review.

<u>Whether Jackson's Sentencing Error Was Harmless</u>

In Florida, a sentencing error is considered harmless if the State can prove beyond a reasonable doubt that there is no reasonable possibility that a lesser sentence would have resulted without the error. <u>Rogers v. State</u>, 511 So. 2d 526, 535 (Fla. 1987) (citing <u>State v. DiGuilio</u>, 491 So. 2d 1129, 1138 (Fla. 1986)). We conclude that the State has failed to satisfy this burden.

The jury in this case was given instructions regarding three aggravating circumstances: HAC, CCP, and the fact that the murder was committed during the course of a sexual battery. The judge instructed the jury that it must render an advisory sentence based on whether sufficient aggravating circumstances existed, and whether those aggravating circumstances outweighed the mitigating

circumstances.  Following these instructions, the jury returned a recommendation of death by a vote of eleven to one.  The jury made no factual findings regarding whether sufficient aggravating circumstances existed, or whether sufficient aggravating circumstances existed which outweighed the mitigating circumstances, as section 921.141 required at the time of Jackson's trial.  The most that can be gleaned from the jury's recommendation is that one juror concluded that sufficient aggravation, if it existed, did not outweigh the mitigation presented.  This nonunanimous advisory recommendation cannot be overlooked in our harmless error analysis.  The fact that a single juror in this case apparently concluded that the aggravation was not sufficient to outweigh the mitigation is itself evidence of reasonable doubt that a different result might have occurred but for the Hurst v. Florida error.

Following that nonunanimous jury recommendation, the judge found the existence of two aggravating circumstances, the felony murder and HAC aggravating circumstances, and afforded each great weight.  We acknowledge that the trial court's finding that the murder was committed during the course of a sexual battery was not erroneous.  The United States Supreme Court indicated in Apprendi and Ring that there was one narrow exception to the Sixth Amendment requirement that a jury must find any fact that increases the maximum sentence: the fact of a prior conviction, as established in Almendarez-Torres.  Ring, 536 U.S.

- 62 -

at 597 n.4; Apprendi, 530 U.S. at 489-90.[9]  Although the Supreme Court has since

suggested that the continued validity of Almendarez-Torres may be questionable, it

has not directly revisited the exception created in that case.  See Alleyne v. United

States, 133 S. Ct. 2151, 2160 n.1 (2013) (recognizing the "narrow exception"

created by Almendarez-Torres, but noting that it was not directly at issue in

Alleyne); Ring, 536 U.S. at 597 n.4 (noting that Almendarez-Torres was not the

subject of Ring's challenge); Apprendi, 530 U.S. at 489 ("[I]t is arguable that

Almendarez-Torres was incorrectly decided . . . .").  On this matter, we find

persuasive the reasoning of the Arizona Supreme Court, which concluded that

unless and until the United States Supreme Court expressly overrules Almendarez-

Torres, that decision remains a valid, if narrow, exception to Apprendi and Ring.

See Ring II, 65 P.3d at 938 ("We cannot ignore a Supreme Court decision

interpreting federal law unless the Court expressly overrules or casts cognizable

doubt on that decision."); see also Whitfield, 107 S.W.3d at 262 & n.7 (finding no

error by judge who found the existence of prior convictions as aggravating

circumstances).  Therefore, the jury in this case was not required to find the

---

9.  In Almendarez-Torres, a federal immigration case, the Court held that the fact that an individual was previously deported because of a conviction for an aggravated felony, which authorized a potential prison term of twenty years, was considered a penalty provision, not a separate crime that must be charged in an indictment and proven beyond a reasonable doubt.  523 U.S. at 226-27.

existence of the aggravating circumstance that Jackson committed the murder during the course of sexual battery because he had already been convicted of sexual battery at the time he was sentenced.

However, this conclusion does not mean that the finding of the felony murder aggravating circumstance alone was sufficient to support Jackson's sentence. When the jury made a nonunanimous recommendation that Jackson be sentenced to death, it did not make factual findings regarding the existence of any—let alone sufficient—aggravating circumstances, nor did it make any findings regarding the relative weight of the aggravating and mitigating circumstances, as section 921.141, Florida Statutes (2007), required. Thus, we cannot say that the fact that Jackson committed this murder during the course of a sexual battery rendered his unconstitutional sentence harmless beyond a reasonable doubt without considering the other aggravating circumstances at issue here.

Turning to those aggravating circumstances, we cannot conclude that the judge's finding of the HAC aggravating circumstance was harmless beyond a reasonable doubt. The focus of the HAC aggravating circumstance is on the circumstances of the murder, particularly the suffering of the victim, as a finding of HAC can only be supported if the murder was "conscienceless or pitiless and unnecessarily torturous to the victim." Orme v. State, 25 So. 3d 536, 551 (Fla. 2009) (quoting Guzman v. State, 721 So. 2d 1155, 1159 (Fla. 1998)). Therefore,

the existence of this aggravating circumstance is heavily fact-dependent.

Moreover, HAC has been recognized as one of the most weighty aggravating circumstances. See, e.g., Rigterink v. State, 66 So. 3d 866, 900 (Fla. 2011) (citing Johnson v. State, 969 So. 2d 938, 958 (Fla. 2007); Barnhill v. State, 834 So. 2d 836, 849 (Fla. 2002)). Accordingly, this Court has previously concluded that an erroneous finding of HAC by a judge is often harmful because of the associated weight of this aggravating circumstance. See, e.g., Perez, 919 So. 2d at 381-82 (citing Morton v. State, 789 So. 2d 324, 331 (Fla. 2001); Larkins v. State, 739 So. 2d 90, 95 (Fla. 1999)). But see Cole v. State, 36 So. 3d 597, 609-10 (Fla. 2010) (concluding that an invalid finding of the HAC aggravating circumstance was harmless beyond a reasonable doubt in light of the remaining valid aggravating circumstances).

In this case, Jackson contested the HAC aggravating circumstance during trial and has asserted before this Court that it was improperly found by the trial court below. This claim was partially predicated on testimony from the medical examiner that Tran could have died within seconds to minutes of receiving the fatal stab wounds; according to Jackson, she would have suffered less if she had died within seconds, rather than minutes.[10] Although we do not address today whether

---

10. Jackson also asserted that the finding of the HAC aggravating circumstance was improperly based on the fact that Tran's body was burned after she had died. See, e.g., Buzia v. State, 926 So. 2d 1203, 1212 (Fla. 2006)

- 65 -

this aggravating circumstance was properly found below, we conclude that the judicial finding of this contested aggravating circumstance—which is by nature a fact-intensive inquiry—was not harmless beyond a reasonable doubt.

A further complicating matter in this case is the fact that the court read the CCP instruction to the jury, but ultimately concluded that the State failed to prove the existence of this aggravating circumstance beyond a reasonable doubt. Although we do not specifically determine whether the CCP instruction was properly administered in this case, we do note that the standard for giving an instruction on an aggravating circumstance is much lower than the standard for finding that circumstance has been proven beyond a reasonable doubt:

> Although an aggravating factor must be proven beyond a reasonable doubt, Johnson v. State, 438 So. 2d 774, 779 (Fla. 1983), a jury instruction on aggravators need only be supported by credible and competent evidence. See Hunter v. State, 660 So. 2d 244, 252 (Fla. 1995). The fact that the State does not prove an aggravating factor to the [court's] satisfaction does not require a conclusion that there was insufficient evidence to allow the jury to consider that factor. Bowden v. State, 588 So. 2d 225, 231 (Fla. 1991). Indeed, where evidence of a mitigating or aggravating factor has been presented to the jury, an instruction on the factor is required. Id.; Stewart v. State, 558 So. 2d 416, 420 (Fla. 1990).

Welch v. State, 992 So. 2d 206, 215 (Fla. 2008). The trial court may very well have been correct both in instructing the jury and ultimately concluding that the

---

("[N]othing done to the victim after the victim is dead or unconscious can support this aggravator.").

State failed to prove the existence of CCP beyond a reasonable doubt. However, it is impossible for us to conclude that the jury would have found the existence of this aggravating circumstance beyond a reasonable doubt from its simple nonunanimous recommendation to sentence Jackson to death. Thus, we cannot conclude that the trial court's findings, which followed a nonunanimous recommendation by the jury, were harmless beyond a reasonable doubt.

### Whether a Life Sentence Pursuant to Section 775.082(2), Florida Statutes, Is the Proper Remedy

Having determined that a harmful error occurred during sentencing, we next consider the appropriate remedy. Jackson insists his sentence must be commuted to life imprisonment pursuant to section 775.082(2), Florida Statutes (2007). This is premised on the argument that Hurst v. Florida left the State of Florida without a valid penalty, similar to the effect that Furman v. Georgia, 408 U.S. 238 (1972), had on capital defendants. However, we disagree with such a broad reading of Hurst v. Florida.

Section 775.082(2) states:

> In the event the death penalty in a capital felony is held to be unconstitutional by the Florida Supreme Court or the United States Supreme Court, the court having jurisdiction over a person previously sentenced to death for a capital felony shall cause such person to be brought before the court, and the court shall sentence such person to life imprisonment as provided in subsection (1).

However, this Court has sparingly applied this statute in the past. After a divided Supreme Court issued Furman, which held that the imposition of the death penalty for defendants convicted of murder or rape violated the Eighth and Fourteenth Amendments, this Court commuted the sentences of the forty inmates who had been sentenced to death under the statute in effect prior to Furman. See Anderson v. State, 267 So. 2d 8, 9 (Fla. 1972). However, Florida's subsequent amendments to its capital sentencing procedures received approval from the Supreme Court, which has not since questioned the validity of capital punishment itself. Proffitt v. Florida, 428 U.S. 242, 247 (1976) (citing Gregg v. Georgia, 428 U.S. 153, 168-87 (1976)); see also Glossip v. Gross, 135 S. Ct. 2726, 2732-33 (2015) (noting, in the context of a challenge to a method of execution, "that because it is settled that capital punishment is constitutional, '[i]t necessarily follows that there must be a constitutional means of carrying it out' " (quoting Baze v. Rees, 553 U.S. 35, 47 (2008) (plurality opinion))). Likewise, after the Supreme Court held that death was an unconstitutional punishment for the crime of rape of an adult woman in Coker v. Georgia, 433 U.S. 584 (1977), this Court invoked section 775.082(2) and vacated a death sentence predicated upon the rape of children. Shue v. State, 366 So. 2d 387, 389-91 (Fla. 1978).

Hurst v. Florida did not hold that the death penalty itself is unconstitutional, nor did it hold that the death penalty was an unconstitutional punishment for the

crimes of which Jackson was convicted.  Hurst v. Florida more narrowly held that certain portions of the procedure dictated in section 941.121 were unconstitutional.  See 136 S. Ct. at 624 ("Florida's sentencing scheme . . . is therefore unconstitutional." (emphasis added)).  More specifically, the decision in Hurst v. Florida only invalidated those provisions of section 921.141 that permitted judicial factfinding rather than factfinding by a jury.  See, e.g., State v. Galindo, 774 N.W.2d 190, 213 (Neb. 2009) ("Of all the statutes composing our death penalty scheme and referring to the death penalty as the maximum punishment for first degree murder, only one, § 29-2522, dealt with who should make the determination of the aggravating circumstances.  Thus, only § 29-2522 violated the principles of jury factfinding set forth by Ring.  It would have been unreasonable to conclude that Ring called into question the remaining provisions of the Nebraska death penalty scheme.  The invalidity of a single provision purely procedural in nature does not automatically invalidate the underlying punishment to which that procedure applies.").  Thus, section 775.082(2) does not apply.

We also refuse to follow the example of the Colorado Supreme Court, which commuted the sentences invalidated by Ring pursuant to a statute that contained similar language to section 775.082(2), Florida Statutes.  Woldt v. People, 64 P.3d 256 (Colo. 2003).  The capital sentencing statute in effect in Colorado at the time Ring was announced was similar to the Arizona statute invalidated by Ring.  Id. at

258-59.  The Colorado Supreme Court held that its capital sentencing statute was facially unconstitutional under Ring and concluded that the proper remedy was to remand for life imprisonment without the possibility of parole after concluding that Colorado law mandated such a result.  Id. at 266-67.  Specifically, that court analyzed the following statute:

> In the event the death penalty as provided for in this section is held to be unconstitutional by the Colorado supreme court or the United States supreme court, a person convicted of a crime punishable by death under the laws of this state shall be punished by life imprisonment.  In such circumstance, the court which previously sentenced a person to death shall cause such person to be brought before the court, and the court shall sentence such person to life imprisonment.

Id. at 267 (quoting Colo. Rev. Stat. § 18-1.3-401(5) (2002)).  After reviewing the legislative history of the relevant statutes, the Colorado Supreme Court concluded that under Colorado law, the language of section 18-1.3-401(5) and the ex post facto concerns of resentencing left that Court without the discretion to remand for resentencing.

We do not adopt the analysis of the Colorado Supreme Court for several reasons.  First, the Woldt Court did not consider the possibility that a Ring error could be harmless beyond a reasonable doubt, which places Colorado in the minority of jurisdictions on this issue.  See, e.g., Allen, 406 F.3d at 948; Ex parte Stephens, 982 So. 2d at 1153; Ring II, 65 P.3d at 933; Williams, 233 P.3d at 1040-41; Capano, 889 A.2d at 977; Lovelace, 90 P.3d at 300; Whitfield, 107 S.W.3d at

- 70 -

262; Jordan, 325 S.W.3d at 70. As explained above, we join the majority rule in holding that a Ring/Hurst v. Florida error is capable of harmless error review. We also note that Woldt was decided three years before the United States Supreme Court held in Recuenco that a Blakely error could be harmless.

The Woldt decision also concluded that resentencing the defendants in that case under revised capital procedures would violate the Ex Post Facto Clauses of the United States and Colorado constitutions. 64 P.3d at 270-72. However, this holding is also inconsistent with the majority of jurisdictions which have found no ex post facto violation in resentencing. E.g., Ring II, 65 P.3d at 945; Brice v. State, 815 A.2d 314, 321 (Del. 2003); Lovelace, 90 P.3d at 302-03; People v. Crutchfield, 820 N.E.2d 507, 517 (Ill. App. Ct. 2004) (finding no ex post facto violation in resentencing a defendant under procedures revised pursuant to Apprendi); Ritchie v. State, 809 N.E.2d 258, 264 (Ind. 2004); Galindo, 774 N.W.2d at 210-11.[11]

Finally, this Court has historically chosen to remand for a new penalty phase when a harmful error occurs during the original penalty phase. See, e.g., Perez,

_____

11. Relatedly, and unusually, the Colorado Supreme Court explained that under Colorado law, subsequent procedural amendments can raise ex post facto concerns. See Woldt, 64 P.3d at 271. By contrast, both the United States Supreme Court and this Court have concluded that procedural amendments to previously invalidated statutes do not violate the Ex Post Facto Clauses of the United States or Florida constitutions. Dobbert v. Florida, 432 U.S. 282, 293 (1977); Shenfeld v. State, 44 So. 3d 96, 100 (Fla. 2010).

919 So. 2d at 381-82 (remanding for new penalty phase after the erroneous finding of HAC was considered harmful in light of the historical weight associated with that aggravating circumstance); Kormondy v. State, 703 So. 2d 454, 462-63 (Fla. 1997) (remanding for new penalty phase for harmful admission of prejudicial, irrelevant evidence in the penalty phase); James v. State, 615 So. 2d 668, 669 (Fla. 1993) (remanding for new penalty phase following invalidation of HAC instruction by Espinosa v. Florida, 505 U.S. 1079 (1992), for defendant who had preserved that error); Atkins v. State, 452 So. 2d 529, 532-33 (Fla. 1984) (remanding for new penalty phase after trial court erroneously considered as an aggravating circumstance an allegation of sexual battery that was not proven for lack of a corpus delicti (citing Elledge v. State, 346 So. 2d 998 (Fla. 1977)). Historically, when evidence has been improperly admitted or excluded in the penalty phase, the jury has been improperly instructed, or the jury recommendation itself has been invalidated, the proper remedy has been to remand for a new penalty phase. See Riley v. Wainwright, 517 So. 2d 656, 658 (Fla. 1987) (concluding that a new jury was required to review penalty phase evidence because prior recommendation, which did not consider nonstatutory mitigation, was invalid); Menendez v. State, 419 So. 2d 312, 314 (Fla. 1982). We conclude that a Hurst v. Florida error is akin to improper jury instructions or an invalid recommendation because the jury was not required to find the existence of the aggravating circumstances or whether

- 72 -

sufficient aggravating circumstances outweighed mitigating circumstances. Therefore, the proper remedy is to remand for a new penalty phase, rather than remand for the imposition of a life sentence.

## CONCLUSION

We reject Jackson's guilt-phase claims and affirm his convictions. However, as we did on remand in Hurst v. State, we conclude in this case that the Hurst v. Florida errors that occurred during sentencing are not harmless beyond a reasonable doubt. Jackson's death sentence was based not upon factual findings by a jury of his peers as required by the Sixth Amendment, but upon a nonunanimous recommendation of the jury. Therefore, we remand this matter to the circuit court for a new penalty phase pursuant to Hurst v. Florida.

It is so ordered.

LEWIS and QUINCE, JJ., concur.
PARIENTE, J., concurs in result with an opinion, in which LABARGA, C.J., concurs.
POLSTON, J., concurs as to the conviction and dissents as to the sentence.
CANADY, J., concurs in result as to the conviction and dissents as to the sentence.
LAWSON, J., did not participate.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

PARIENTE, J., concurring in result.

I concur because we cannot conclude that the Hurst[12] error was harmless

beyond a reasonable doubt. However, I would reach this conclusion under an

analysis consistent with this Court's opinions in Hurst and Simmons v. State, 41

Fla. L. Weekly S622 (Fla. Dec. 22, 2016), as well as Deviney v. State, No. SC15-

1903 (slip op. issued Fla. March 23, 2017), which specifically explain the standard

for determining whether a Hurst error is harmless beyond a reasonable doubt. The

majority's discussion of harmless error in this case (beginning on page 58), while

not incorrect, may create confusion as to how to analyze whether a Hurst error is

harmless. See majority op. at 58-67.

In Hurst, we explained the standard by which harmless error should be

evaluated:

> Where the error concerns sentencing, the error is harmless only if
> there is no reasonable possibility that the error contributed to the
> sentence. See, e.g., Zack v. State, 753 So. 2d 9, 20 (Fla. 2000).
> Although the harmless error test applies to both constitutional errors
> and errors not based on constitutional grounds, "the harmless error
> test is to be rigorously applied," [State v. ]DiGuilio, 491 So. 2d
> [1129,] 1137 [(Fla. 1986)], and the State bears an extremely heavy
> burden in cases involving constitutional error. Therefore, in the
> context of a Hurst v. Florida error, the burden is on the State, as the
> beneficiary of the error, to prove beyond a reasonable doubt that the
> jury's failure to unanimously find all the facts necessary for

---

12. Hurst v. State (Hurst), 202 So. 3d 40 (Fla. 2016), petition for cert. filed,
No. 16-998 (U.S. Feb. 13, 2017).

imposition of the death penalty did not contribute to Hurst's death sentence in this case. We reiterate:

> The test is not a sufficiency-of-the-evidence, a correct result, a not clearly wrong, a substantial evidence, a more probable than not, a clear and convincing, or even an overwhelming evidence test. Harmless error is not a device for the appellate court to substitute itself for the trier-of-fact by simply weighing the evidence. The focus is on the effect of the error on the trier-of-fact.

DiGuilio, 491 So. 2d at 1139. "The question is whether there is a reasonable possibility that the error affected the [sentence]." Id.

Hurst v. State (Hurst), 202 So. 3d 40, 68 (Fla. 2016) (last alteration in original). In Davis v. State, 207 So. 3d 142 (Fla. 2016), we explained, "As applied to the right to a jury trial with regard to the facts necessary to impose the death penalty, it must be clear beyond a reasonable doubt that a rational jury would have unanimously found that there were sufficient aggravating factors that outweighed the mitigating circumstances." Id. at 174.

Further, I would not reanalyze the scope of or proper remedy for Hurst errors, which the majority discusses on pages 67-73, because we already addressed these issues, including the inapplicability of section 775.082, Florida Statutes, in Hurst, 202 So. 3d at 65-66. I would summarily dispose of this claim, as we have done in several cases, including Deviney, in which we stated that "this Court already rejected [the] argument that section 775.082(2), Florida Statutes (2015),

requires a remand to the trial court for imposition of a life sentence." Slip op. at 15.

As for the harmless error analysis in this case, the jury was given instructions regarding three aggravating factors: HAC, CCP, and that the murder was committed during the course of a sexual battery. Majority op. at 61. The judge instructed the jury that it must render an advisory sentence recommendation based on whether sufficient aggravating factors existed to impose death and whether those aggravating factors outweighed the mitigating circumstances. Majority op. at 61. Following these instructions, the jury returned a recommendation of death by a vote of eleven to one. Majority op. at 62. The jury made none of the requisite factual findings necessary to impose death. See Hurst, 202 So. 3d at 44. In fact, although the CCP aggravating factor was submitted to the jury, the trial court did not even find that this aggravating factor was proven.

With regard to mitigation, Jackson presented a considerable amount of mental health mitigation, including evidence of his low IQ, dysfunctional childhood (his biological mother was fourteen and his father abandoned him), and that he was physically and sexually abused. Jackson also presented the testimony of two mental health experts who testified to the effects of his Adverse Childhood Experiences (ACE's) on his conduct. Majority op. at 15-18. Although there was

contrary mental health testimony from the State, we have no way of determining the effect of this mitigation on the jury's final recommendation for life or death.

It is impossible to determine why one juror dissented from the other members' vote to recommend a sentence of death—whether the juror did not determine that each aggravating factor was proven, that sufficient aggravating factors existed to impose death, or that the aggravation that existed outweighed the mitigation, or if that juror, for some other reason, determined that death was not an appropriate sentence. Thus, we cannot conclude that the <u>Hurst</u> error in Jackson's case was harmless beyond a reasonable doubt, or that the <u>Hurst</u> error "did not contribute to [Jackson's] sentence." <u>Deviney</u>, No. SC15-1903, slip op. at 14.

For all these reasons, I concur in result but would adhere to the harmless error analysis we adopted in <u>Hurst</u>.

LABARGA, C.J., concurs.

An Appeal from the Circuit Court in and for Hillsborough County,
    William Fuente, Judge - Case No. 292007CF019884000AHC

Howard L. "Rex" Dimmig, II, Public Defender, and Julius J. Aulisio, Assistant
Public Defender, Tenth Judicial Circuit, Bartow, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and C. Suzanne Bechard,
Assistant Attorney General, Tampa, Florida,

    for Appellee

Karen M. Gottlieb of Florida Center for Capital Representation, Florida International University College of Law, Miami, Florida,

    for Amicus Curiae Florida Center for Capital Representation at Florida International University College of Law